UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
BNP PARIBAS                                                :
                                                           :
                Interpleader-Plaintiff,                    :    09 Civ. 5351 (DLC)
                                                           :
        - against -                                        :
                                                           :
WAYZATA OPPORTUNITIES FUND II, LP;                         :
et al,                                                     :
                                                           :
                Interpleader-Defendants.                   :
                                                           :
-----------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND ORDER DISTRIBUTING PROCEEDS

Joseph T. Baio
Joanna R. Rotgers
Jaime L. Lavin
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000
Fax: (212) 728-8111
*Attorney for the Black Diamond, Denali, and Eaton Vance Entities and General Electric Capital Corporation*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ...........................................................................................................................3

      A.      Propex and The Lenders Entered Into The Credit Agreement .................................3

      B.      Propex Filed For Bankruptcy Protection And Sold Its Assets At Auction ..............4

      C.      The Participating Lenders Sought Payment of Enforcement Fees
              and Expenses ............................................................................................................6

      D.      The Participating Lenders Amended The Credit Agreement ..................................6

      E.      BNP Filed This Interpleader Action .........................................................................9

ARGUMENT .................................................................................................................................9

I.      INTERPLEADER IS PROPER. ........................................................................................9

II.     THE PARTICIPATING LENDERS ARE ENTITLED TO SUMMARY
        JUDGMENT AND AN ORDER REQUIRING BNP TO PAY
        ENFORCEMENT FEES AND EXPENSES. ..................................................................11

      A.      The Credit Agreement Clearly Provides For The Payment Of Lenders'
              Enforcement Fees and Expenses ............................................................................12

      B.      The Participating Lenders' Amendment To The Credit Agreement's
              Distribution Provision Is Valid. .............................................................................12

      C.      The Participating Lenders Are Entitled To Have The Enforcement Fees
              And Expenses Paid. ................................................................................................15

CONCLUSION ............................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**                  **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 11

*Bailey v. Fish & Neave*, 8 N.Y. 3d 523 (2007) ............................................................................... 13

*Banca Della Svizzera Italiana v. Cohen*, 756 F. Supp. 805 (S.D.N.Y. 1991) ............................. 16

*Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516 (1976) ................................... 12

*Fidelity Summer St. Trust, v. Toronto Dominion (Texas), Inc.*,
    No. Civ. A. 02-11285-GAO, 2002 WL 1858763 (D. Mass. Aug. 14, 2002) .................. 14

*Graham v. Henderson*, 89 F.3d 75 (2d Cir. 1996) ......................................................................... 11

*Highland Crusader Offshore Partners, L.P. v. Lifecare Holdings, Inc.*,
    No. 3:08-cv-0102-B, 2008 WL 3925272 (N.D. Tex. Aug. 27, 2008) ..................... 14, 15

*Johnson v. Goord*, 445 F.3d 532 (2d Cir. 2006) .......................................................................... 11

*Musicland Holding Corp. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*,
    386 B.R. 428 (S.D.N.Y. 2008) ......................................................................................... 13

*Nemazee v. Premier, Inc.*, 232 F. Supp. 2d 172 (S.D.N.Y. 2002) ................................................ 10

*Norwest Fin., Inc. v. Fernandez*, 121 F. Supp. 2d 258 (S.D.N.Y. 2000) ..................................... 16

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 912 F. Supp. 77
    (S.D.N.Y. 1996) ................................................................................................................ 16

*Springsteen v. Samson*, 32 N.Y. 703 (1865) ................................................................................. 13

*Strother v. Harte*, 171 F. Supp. 2d 203 (S.D.N.Y. 2001) ............................................................. 11

*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004) ............................... 12

*Weisshaus v. New York*, No. 08 Civ. 4053, 2009 WL 2579215
    (S.D.N.Y. Aug. 20, 2009) .................................................................................................... 4

*Wright v. Goord*, 554 F.3d 255 (2d Cir. 2009) ............................................................................. 11

Certain Participating Lenders[1] hereby submit their memorandum of law in support of their Motion for Summary Judgment and Order Distributing Proceeds pursuant to Federal Rule of Civil Procedure 56(c), which order provides for the payment of $648,782.13 in Enforcement Fees and Expenses (denominated "Disputed Proceeds" in the Interpleader Complaint) incurred by the Participating Lenders.[2]

## PRELIMINARY STATEMENT

At issue in this case is the right of Participating Lenders to get the benefit of a contractually-granted right – the right to obtain payment of their fees and expenses incurred to enforce the obligations of their borrower, Propex, which filed for bankruptcy protection in 2008. By early 2009, Participating Lenders held more than half of the $225 million that had been loaned to Propex under the Credit Agreement. When Propex proposed to sell its assets for $61 million (subject to a purchase price adjustment), Participating Lenders objected on the basis that it would result in too little recovery for Lenders. Specifically, the Participating Lenders argued

---

[1] Movants are Certain Participating Lenders, a group of Interpleader Defendants comprised of the following entities: Black Diamond Capital Management, L.L.C.; Black Diamond Commercial Finance, L.L.C.; BDCM Opportunity Fund II, L.P.; Black Diamond International Funding, Ltd.; Black Diamond CLO 2006-01 (Cayman), Ltd.; Black Diamond CLO 2005-1 Ltd.; and Black Diamond CLO 2005-2 Ltd. (collectively, the "Black Diamond Entities"); Senior Debt Portfolio, Eaton Vance Institutional Senior Loan Fund, Eaton Vance Senior Income Trust, Eaton Vance Short Duration Diversified Income Fund, Eaton Vance Limited Duration Income Fund, Eaton Vance VT Floating-Rate Income Fund, Eaton Vance Floating-Rate Income Trust, Eaton Vance Senior Floating-Rate Trust, and Grayson & Co. (collectively, the "Eaton Vance Entities"); Denali Capital V, LTD, Denali Capital VI, LTD, Denali Capital VII, LTD (collectively, the "Denali Entities"), and General Electric Capital Corporation, which jointly answered the Complaint on September 8, 2009.

Together with Diamond Springs Trading, LLC; Classic Cayman B.D. Limited; Beltway Capital, LLC; Serves 2006-1, Ltd.; Regiment Capital LTD; Cavalry CLO I, LTD.; PPM Monarch Bay Funding LLC; and PPM Shadow Creek Funding LLC. Certain Participating Lenders are referred to herein as "Participating Lenders" who have requested the payment of Enforcement Fees and Expenses.

[2] Filed concurrently herewith are (i) the Declaration of Roy Gallagher sworn to September 17, 2009, cited to herein as "Gallagher Decl."; (ii) the Declaration of Paul V. Shalhoub sworn to September 18, 2009, cited to herein as "Shalhoub Decl."; and (iii) the Declaration of William L. Norton III sworn to September 17, 2009, cited to herein as "Norton Decl."

that the $61 million bid was likely to be adjusted downward to approximately $36 million and, even at $61 million, the bid was for less than liquidation value of Propex's assets. After the Participating Lenders' objected and made their own bid, Propex accepted a fixed bid of $82 million made by entities controlled by Wayzata Opportunities Fund II, LP ("Wayzata"), which was another Lender in the credit facility. In connection with the objection – which, together with the Participating Lenders' own bid, led to at least a $20 million increase in the sale price (and thereby increased recovery for all Lenders) – the Participating Lenders incurred $648,782.13 in fees and expenses.

        The Credit Agreement plainly granted Participating Lenders the right to payment of fees and expenses incurred in connection with their objection. However, a separate provision of the Credit Agreement concerning distributions of the proceeds of Lenders' collateral and setting forth the order in which such distributions should be made omitted mention of such payments to Lenders. When this omission in the distribution provision came to the attention of the Participating Lenders, they amended the distribution provision of the Credit Agreement to provide for the payment of Enforcement Fee sand Expenses. The Participating Lenders had the power to make the amendment pursuant to the Credit Agreement, which generally allowed amendments made by Lenders holding 50% of the outstanding debt.

        Now standing in the way of Participating Lenders' right to receive payment of their fees and expenses is Wayzata, the successful bidder for Propex's assets and a party to the Credit Agreement with the same right to payment of Enforcement Fees and Expenses incurred that Participating Lenders have. Although the Participating Lenders amended the Credit Agreement strictly in accordance with its terms, Wayzata challenges the Participating Lenders' right to payment of their Enforcement Fees and Expenses. Indeed, by threatening legal action

against BNP, Wayzata prevented the Participating Lenders from receiving the payments they were due and prompted the filing of this action.

The delay in payment of Participating Lenders' right to payment of their Enforcement Fees and Expenses should end now. There are no genuine issues of material fact to be resolved and this Court need only apply well-settled legal principles to grant summary judgment in favor of the Participating Lenders and order BNP to distribute the proceeds it has withheld, $648,782.13, to the Participating Lenders in satisfaction of their Enforcement Fees and Expenses.

## BACKGROUND

A. <u>Propex and The Lenders Entered Into The Credit Agreement</u>

In a Credit Agreement dated as of January 31, 2006 (the "Credit Agreement"), a group of lenders, including the Participating Lenders, agreed to make loans to Propex Fabrics, Inc. ("Propex") with a variable borrowing limit, as described in the Credit Agreement, of approximately $195 million. (*See* Credit Agmt., § 1.1, p. 4.) BNP Paribas, in addition to being a lender under the Credit Agreement, was appointed Administrative Agent. (*See* Credit Agmt., p. 1.) The Lenders, in the aggregate, loaned more than [$225 million] to Propex in the credit facility established pursuant to the Credit Agreement. (*See* Gallagher Decl., Ex. A.)

The Credit Agreement, as is typical, provided that Propex was to pay for, among other things, the costs of negotiating, preparing and executing the loan documents. (*See* Credit Agmt § 10.2.) Propex also agreed to pay, without caveats or limitations, the expenses of all Lenders in enforcing any obligations in the loan documents, specifically:

> <u>all costs and expenses, including reasonable attorneys' fees</u> . . ., fees, costs and expenses of accountants, advisors and consultants and costs of settlement, <u>incurred by</u> Administrative Agent and <u>Lenders in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder</u> or under the other

- 3 -

> Loan Documents (including in connection with the sale of, collection from, or other realization upon any o the Collateral or the enforcement of the Loan Documents) <u>or in connection with any refinancing or restructuring of the credits arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings</u>.

(Credit Agmt. § 10.2(x), pp. 137-38 (emphases added).) No other provision of the Credit Agreement restricts or makes conditional the Lenders' rights to receive payment of costs and expenses (including reasonable attorneys' fees) incurred in connection with enforcing the Obligations under the Credit Agreement.

      B.    <u>Propex Filed For Bankruptcy Protection And Sold Its Assets At Auction</u>

Two years after the Credit Agreement was executed, on January 18, 2008, Propex and certain of its related entities filed voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Tennessee, Southern Division (the "Bankruptcy Court"),[3] triggering, among other things, an Event of Default under the Credit Agreement. (*See* Credit Agmt. § 8.7, p. 124-25.)

In early 2009, the Bankruptcy Court approved a "Stalking Horse" bid procedure for the sale of Propex's assets, using a $61.56 million bid for Propex by Xerxes Operating Company L.L.C. and Xerxes Foreign Holdings Corp. – entities majority owned by Wayzata Opportunities Fund II LP – as the Stalking Horse bid. (*See* Order (A) Approving Bid Procedures Relating to Sale of Substantially All of the Debtors' Assets ("Bid Procedures Order"), Bankr. Docket No. 924.) The $61.56 million bid was subject to adjustment based upon a net asset value

---

[3]   *See In re Propex*, Case No. 08-10249, Docket No. 1. Citations to filings in *In re Propex*, Case No. 08-10249 in the Bankruptcy Court will be hereinafter referred to as "Bankr. Docket No." In the context of this motion for summary judgment, it is appropriate for the Court to take judicial notice of the filings in the bankruptcy proceeding. *See, e.g.*, *Weisshaus v. New York*, No. 08 Civ. 4053, 2009 WL 2579215 at *5 (S.D.N.Y. Aug. 20, 2009) (Cote, J.) (taking judicial notice of court filings in deciding motion to dismiss).

formula. (*See id.*) The Participating Lenders made a conditional objection to the proposed sale, arguing that the Stalking Horse bid for $61.56 million would mean a sale of Propex's assets (the Lenders' collateral) for less than their liquidation value and that the bid was likely be adjusted downward to approximately $36 million, resulting in an even poorer recovery for Lenders. (*See* Conditional Objection of Black Diamond Capital Management, L.L.C. to Debtors' Motion and Bankruptcy Code Sections 363 and 365 And Bankruptcy Rules 6004 and 6006 and Subject Thereto (A) for the Sale Free And Clear of Liens, Claims, Encumbrances and Interests of Substantially All of the Debtors' Assets to the Highest Bidder And (B) for the Assumption and Assignment of Designated Contracts, Bankr. Docket No. 952.) In connection with that objection, Participating Lenders incurred fees and expenses totaling $648,782.13 comprised of (i) $383,840.92 in attorneys' fees owed to Willkie Farr & Gallagher LLP for its work in connection with the objection in the Bankruptcy Court, (ii) $24,537.52 in attorneys' fees owed to Bradley Arant Boult Cummings LLP for its work in connection with the same objection, and (iii) $240,403.69 owed to Hilco Appraisal Services in connection with an appraisal performed to support the objection (altogether, "Enforcement Fees and Expenses"). (*See* Cplt., Ex. B.)

On March 23, 2009, a Bankruptcy Court-approved auction for Propex's assets was held. (*See* Bid Procedures Order, Bank. Docket No. 924.) The Xerxes entities, controlled by Wayzata, were the successful bidders with a fixed bid of $82 million in cash. (*See* Transcript regarding Hearing Held March 24, 2009, Bankr. Docket No. 1053, at 11:23-24.) The Participating Lenders submitted a bid of approximately $81 million, which was unsuccessful. (*See id.* at 11:24-12:1.) The Participating Lenders withdrew their conditional objection to the sale after the sale price obtained for the Debtors' assets was increased through the auction. (*See*

*id.* at 22:2-16.) The asset sale transaction between Propex and Xerxes closed April 27, 2009. (*See* Cplt. ¶ 75; Wayzata Answer ¶ 75; Wayzata Cross-Claim ¶ 3.)

        C.     <u>The Participating Lenders Sought Payment of Enforcement Fees and Expenses</u>

Before the closing, on April 24, 2009, the Participating Lenders, acting through Black Diamond Capital Management, requested that BNP, pursuant to Section 10.2(ix) of the Credit Agreement, pay fees and expenses the Participating Lenders incurred relating to the enforcement of the Obligations under the Credit Agreement. (*See* Cplt., Ex. B.) As the April 24 Letter makes clear, the Participating Lenders did not request payment of fees and expenses relating to their unsuccessful bid at the auction for Propex's assets and requested payment only for Enforcement Fees and Expenses. (*See* Cplt., Ex. B, at 2 ("All Bid Fees and Expenses have been excluded. . . .").)

BNP did not pay the Participating Lenders' Enforcement Fees and Expenses following the April 24 Letter, nor did it forward payment after a follow-up request of May 1, 2009. (*See* Cplt., Ex. C.) In late April, having received the proceeds of the sale of Propex's assets to the auction winner, Wayzata, BNP made final pro rata distributions to Lenders under the Credit Agreement. (*See* Gallagher Decl. ¶ 9.) BNP withheld from those distributions the Enforcement Fees and Expenses that Participating Lenders had requested. (*See* Gallagher Decl. ¶ 8.) The final distributions to Lenders (minus the withheld Enforcement Fees and Expenses) consisted of approximately 21% of the amount owed to the Lenders under the Credit Agreement. (*See* Gallagher Decl. ¶ 9.)

        D.     <u>The Participating Lenders Amended The Credit Agreement</u>

The Participating Lenders came to understand that BNP's non-payment of the Enforcement Fees and Expenses may have stemmed from uncertainty surrounding the language in Section 2.4(D) of the Credit Agreement, entitled "Application of Proceeds of Collateral and

Payments after Event of Default," which provided an order in which BNP was to distribute the proceeds of, in this case, the sale of Propex's assets in an auction. (*See* Gallagher Decl. ¶ 10.) That order was:

> First, "to the payment of all costs and expenses of such sale, collection or other realization, all other expenses liabilities and advances made or incurred by Administrative Agent in connection therewith, and all amounts for which Administrative Agent is entitled to compensation (including the fees described in subsection 2.3), reimbursement and investment under any Loan Document and all advance made by Administrative Agent thereunder for the account of the applicable Loan Party, and to the payment of all costs and expenses paid or incurred by Administrative Agent in connection with the Loan Documents, all in accordance with subsections 9.4, 10.2 and 10.3 and the other terms of this Agreement and Loan Documents";
>
> Second, "to the payment of all other Obligations and the obligations of Loan Parties under any Hedge Agreement between and a Swap Counterparty for the ratable benefit of the holders therefore (subject to the provisions of subsection 2.4C(ii) hereof)"; and
>
> Third, "to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct."

(Credit Agmt. § 2.4D, p. 55.) Although the above provision clearly set out BNP's obligation to pay first its own fees and expenses, including those that Propex was required to pay pursuant to Section 10.2 of the Credit Agreement, it omits entirely from the order of distributions the Section 10.2(ix) requirement that the fees and expenses of Lenders in enforcing the Obligations are to be borne by Propex.

Faced with the omission of Section 10.2(ix) Enforcement Fees and Expenses from the order of distributions in Section 2.4D, the Participating Lenders amended the Credit Agreement on May 15, 2009 – as they were entitled to do – to provide that the Administrative

Agent should pay Enforcement Fees and Expenses after paying its own fees and expenses but before making any other distributions. (*See* Cplt., Ex. D.)

The Credit Agreement contains a detailed provision setting forth the requirement for making amendments. (*See* Credit Agmt. § 10.6.) It provides generally that "[n]o amendment, modification, termination or waiver of any provision of this Agreement of or the Notes, and no consent to any departure by Company therefore, shall in any event be effective without the written concurrence of Requisite Lenders"[4] and then goes on to provide a lengthy and detailed list of exceptions to this general rule that amendments require only the consent of the Requisite Lenders. (*See* Credit Agmt. § 10.6, p. 141-42.) For example, any amendment that "reduce[s] the principal amount of any Loan" or postpones the maturity date or decreases the interest rate must be agreed by "each Lender with Obligations directly affected." (*Id.* at § 10.6(a).) Nothing in the provision governing amendments restricts the ability of Requisite Lenders to amend the order of distributions in Section 2.4D. The amendment provision, in fact, specifically mentions Section 2.4, but prohibits only amendments with "the effect of changing any interim scheduled payments, voluntary or mandatory prepayments, or commitment reductions applicable to a Class in a manner that disproportionately disadvantages such Class relative to any other Class" without the consent of the disadvantaged Class. (*Id.* at § 10.6(b)(v).)

On May 15, 2009, the Participating Lenders advised BNP that they had amended Section 2.4D of the Credit Agreement:

> (a)   To add a new Section 2.4D(ii) to the Credit Agreement that provides: "(ii) thereafter, to the payment of Enforcement Fees and

---

[4]   "'Requisite Lenders' means Lenders having or holding more than 50% of the sum of the aggregate Tranche B Term Loan exposure of all Lenders plus the aggregate Bridge Loan Exposure of all Lenders plus the aggregate Revolving Loan Exposure of all Lenders," which is all of the loans under the Credit Agreement. (Credit Agmt. § 1.1, p. 30.)

- 8 -

> Expenses referenced in the April 24 Letter, and such other fees and expenses incurred by one or more of the Participating Lenders' enforcement of the Obligations;" and
>
> (b)     To re-number existing Sections 2.4D(ii) and (iii) (i.e., prior to giving effect to the amendment referenced in (a) above), to Sections 2.4D(iii) and (iv).

(*See* Cplt., Ex. D, at 2.) The Participating Lenders also provided to BNP evidence of their consent. (*See* Cplt., Ex. D.) The Participating Lenders held more than 50% of the aggregate loans outstanding under the Credit Agreement (*see* Gallagher Decl. ¶ 12 & Ex. A), and therefore comprised the Requisite Lenders under the Credit Agreement whose consent was required to make the amendment. (*See* Credit Agmt. § 1.1.)

### E.     BNP Filed This Interpleader Action

Notwithstanding being advised in the May 15 Letter of the amendment to the Credit Agreement that resolved definitively any uncertainty as to the payment of Enforcement Fees and Expenses, BNP did not pay the Enforcement Fees and Expenses. (*See* Gallagher Decl. ¶ 15.) Instead, on June 9, 2009, BNP filed the instant interpleader action, requesting that the Court resolve the distribution of the Enforcement Fees and Expenses that BNP withheld from final distributions to Lenders. (*See* Cplt.) On June 17, 2009, BNP deposited $648,782.13, the amount of the requested Enforcement Fees and Expenses, with the Court. (*See* Docket No. 3.)

The Participating Lenders now seek summary judgment in their favor and an order from the Court instructing BNP to pay to the Enforcement Fees and Expenses of the Participating Lenders.

## ARGUMENT

### I.     INTERPLEADER IS PROPER.

Jurisdiction is proper under the interpleader statute, 28 U.S.C. § 1335, which provides:

> The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more, . . . if
>
> (1) Two or more adverse claimants, of diverse citizenship . . . are claiming or may claim to be entitled to such money or property, or to any one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation; and if
>
> (2) the plaintiff has deposited such money or property or has paid the amount of or the loan or other value of such instrument or the amount due under such obligation into the registry of the court. . . .

28 U.S.C. § 1335(a). All the elements are met here.

The interpleader action commenced by BNP has as its subject $648,782.13, the Participating Lenders' requested Enforcement Fees and Expenses. On June 17, 2009, BNP deposited that amount with the Court. (*See* Docket No. 3.) The Participating Lenders have, by letters dated April 24, May 1 and May 15, their Answer, and by the instant motion, asserted their entitlement to the Enforcement Fees and Expenses. Wayzata, by its answer, admits to informing BNP that if BNP paid the Enforcement Fees and Expenses to the Participating Lenders, Wayzata would institute legal proceedings against BNP. (*See* Cplt ¶ 89; Wayzata Answer ¶ 89; *see also* Wayzata Second Cross Claim ¶ 21 (alleging an "actual dispute" as to "the entitlement to, and reasonableness and necessity of, legal fees and expenses incurred").) These competing contentions satisfy the "adverse claimants" requirement. Finally, Wayzata has not denied that its general or limited partners are citizens of states other than Connecticut,[5] and Black Diamond Capital Management L.L.C. is a citizen of Connecticut. *See generally Nemazee v. Premier, Inc.*,

---

[5] BNP has alleged that there exists diversity of citizenship sufficient to satisfy 28 U.S.C. § 1335(a) (*see* Cplt. ¶¶ 67-69) and Wayzata has not denied those allegations. (*See* Wayzata Answer ¶¶ 67-69.)

- 10 -

232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002) ("For purposes of diversity jurisdiction, a limited partnership has the citizenship of each of its general and limited partners."); *Strother v. Harte*, 171 F. Supp. 2d 203, 205 (S.D.N.Y. 2001) ("For purposes of diversity jurisdiction, a limited liability company has the citizenship of each of its members").

As interpleader jurisdiction is satisfied, it is appropriate for the Court to consider the merits and the instant motion for summary judgment.

## II. THE PARTICIPATING LENDERS ARE ENTITLED TO SUMMARY JUDGMENT AND AN ORDER REQUIRING BNP TO PAY ENFORCEMENT FEES AND EXPENSES.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (a genuine issue is one that "can 'reasonably be resolved in favor of either party'" (quoting *Anderson*, 477 U.S. at 250)). Although all factual inferences are to be drawn and ambiguities resolves in favor of the non-moving party, *see Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006), an opponent to a summary judgment motion "may not merely rest on the allegations or denials of his pleading" and "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

There is no genuine dispute as to any of the relevant facts here; the Court need only resolve issues of law – which are well-settled and have a straightforward application to the undisputed facts – in order to award summary judgment in favor of the Participating Lenders and order BNP to pay the Participating Lenders' Enforcement Fees and Expenses.

    A.    <u>The Credit Agreement Clearly Provides For The Payment Of Lenders' Enforcement Fees and Expenses.</u>

The Credit Agreement's provision entitled "Expenses" grants Lenders an unconditional right to have fees and expenses they incur in enforcing Propex's obligations under the credit facility paid by Propex. The provision states, in relevant part, that:

> Whether or not the transactions contemplated hereby shall be consummated, the Company agrees to pay promptly . . . (ix) all costs and expenses, including reasonable attorneys' fees . . ., fees, costs and expenses of accountants, advisors and consultants and costs of settlement, incurred by Administrative Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder . . .

(Credit Agmt. § 10.2.) Such provisions are valid and enforceable under New York law.[6] *See, e.g.*, *Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d 516, 523 (1976) (upholding contractual provision for the payment of attorneys' fees). The fees and expenses incurred by Participating Lenders in connection with their objection to the Propex sale fees incurred "in enforcing any Obligations of or in collecting any payment due from [Propex]" and, therefore, are to be borne by Propex. The Credit Agreement, accordingly, grants Participating Lenders an unequivocal right to payment of their Enforcement Fees and Expenses.

    B.    <u>The Participating Lenders' Amendment To The Credit Agreement's Distribution Provision Is Valid.</u>

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." *Vermont Teddy*

---

[6] The Credit Agreement contains a New York choice of law provision and so New York law governs its construction. The Credit Agreement's "Applicable Law" provision states: "This Agreement and the other Loan Documents (except as otherwise expressly set forth in any such Loan Document) and the rights and obligations of the parties hereunder and thereunder shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the State of New York (including section 5-1401 of the General Obligations Law of the State of New York), without regard to conflicts of laws principles that would require application of another law." (Credit Agmt. § 10.15, p.145.)

*Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (quoting *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)); *see also Springsteen v. Samson*, 32 N.Y. 703, 706 (1865) ("where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language"). The Credit Agreement, like all contracts – and in particular commercial contracts heavily negotiated by the parties thereto – should be enforced according to its clear and express terms.

There can be no doubt that the Participating Lenders complied with the express provision of the Credit Agreement pertaining to amendments when they amended the Credit Agreement's distribution provision, Section 2.4(D). (*See* Cplt., Ex. D.) The Credit Agreement generally permits amendments with the consent of the Requisite Lenders, except for limited but detailed exceptions, none of which are applicable here. (*See* Credit Agmt. § 10.6.) There is no dispute that the Participating Lenders held more than 50% the amounts borrowed under the Credit Agreement (*see* Gallagher Decl., Ex. A) and that, accordingly, under the definition set forth in the Credit Agreement, the Participating Lenders constituted the Requisite Lenders whose consent was required to amend the agreement.

Courts applying New York law have routinely upheld the validity of amendments where carried out in accordance with the original contract's express terms. *See, e.g., Musicland Holding Corp. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*, 386 B.R. 428 (S.D.N.Y. 2008); *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 529 (2007) (validating amendment to partnership agreement's compensation/payment system without unanimous consent of partners; partnership agreement only required majority vote). For example, in *Musicland*, trade creditors challenged lenders' amendment to the credit agreement, which added lenders to the revolving credit facility and had the effect of giving the additional lenders a higher priority lien than the

trade creditors. 386 B.R. at 432-35. The court held that the unambiguous terms of the credit agreement authorized the amendment and dismissed the trade creditors' complaint asserting breach of contract and breach of the covenant of good faith and fair dealing. *Id.* at 437.

Federal courts applying New York law have also validated amendments to credit agreements that were approved by less than all of the lenders. *See Highland Crusader Offshore Partners, L.P. v. Lifecare Holdings, Inc.*, No. 3:08-cv-0102-B, 2008 WL 3925272, at *6 (N.D. Tex. Aug. 27, 2008) (validating amendment agreed by Required Lenders without notice to or consent of other lenders to Credit Agreement and dismissing claims for breach of contract and breach of covenant of good faith and fair dealing brought by lenders that were not notified of or asked to consent to amendment); *Fidelity Summer St. Trust, v. Toronto Dominion (Texas), Inc.*, No. Civ. A. 02-11285-GAO, 2002 WL 1858763, at *3 (D. Mass. Aug. 14, 2002) (validating amendment that restricted assignment of loans because amendment provision generally permitted amendment based on consent of Requisite Lenders and assignment was not one of nine enumerated types of amendments for which consent of all lender was required).

In both cases, the credit agreements, like the one here, could be amended with the consent of the "Required" or "Requisite" lenders – those representing more than fifty-percent of the credit facility's exposures. *See Highland Crusader*, 2008 WL 3925272, at *6; *Fidelity*, 2002 WL 1858763, at *3. And in both cases, the courts rejected claims brought by lenders who were not notified of and did not consent to the proposed amendment, even where the lenders claimed the amendment caused them some loss of benefit or disadvantage. *See Highland Crusader*, 2008 WL 3925272, at *6 (lender not offered opportunity to consent to amendment or fee paid to other lenders for consenting); *Fidelity*, 2002 WL 1858763, at *3 (amendment restricted lender from assigning loans without consent of other lenders). As one of the courts explained:

> Requiring notifications to or negotiations with all of the lenders would be adding a term that is inconsistent with this unambiguous contract. As the [Borrower] claim[s], the Credit Agreement allows them to deal with less than all of the lenders when amending the Credit Agreement. Requiring notice to or negotiation with all of the lenders would write this benefit out of the contract.

*Highland Crusader*, 2008 WL 3925272, at *6 (internal citations omitted). The above precedents clearly indicate that New York law upholds amendments made in accordance with a contract's terms and warrant validation of the Participating Lenders' amendment to Section 2.4(D) of the Credit Agreement.

Given the absence of any factual issues concerning the making of the amendment and the clear New York law favoring the enforcement of amendments that comply with the terms of the original contract, this Court should order that the Section 2.4(D) of the Credit Agreement has been amended as set forth in the May 15 Letter and that Enforcement Fees and Expenses have second priority under the Credit Agreement pursuant to Section 2.4(D)(ii), as amended.

### C. The Participating Lenders Are Entitled To Have The Enforcement Fees And Expenses Paid.

Section 10.2 of the Credit Agreement grants Lenders an unconditional right to receive payment from Propex for "all costs and expenses, including reasonable attorneys' fees . . . incurred . . . in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder. . . ."

The Enforcement Fees and Expenses were all incurred in connection with the enforcement of the Participating Lenders' rights under the Credit Agreement and associated documents, namely the Participating Lenders' objection to a sale of Propex's assets at less than the liquidation value. (*See* Cplt., Ex. B; Gallagher Decl. ¶ 7.) The appraisal obtained by the Participating Lenders was integral to that objection and so the costs and expenses associated with that appraisal – $240,403.69 – are plainly within the ambit of Section 10.2.

Likewise, the attorneys' fees portion of the Enforcement Fees and Expenses satisfies Section 10.2. The fees of Willkie Farr & Gallagher LLP and Bradley Arant Boult Cummings LLP, which total $408,378.44, were incurred in objecting to a proposed sale of Propex's assets for $61 million – a sale that would have been sub-optimal for all Lenders in the $225 million credit facility because the $61 million bid was less than the liquidation value of Propex's assets and was subject to adjustment downward. All Lenders benefited from Participating Lenders' efforts to maximize recoveries. Wayzata, were it not the original Stalking Horse bidder at $61 million and ultimately successful bidder at $82 million, would have had no reason to complain about the Enforcement Fees and Expenses incurred. Tellingly, Wayzata is the only Lender that has disputed the requested payment of Enforcement Fees and Expenses.

The bills of Willkie Farr & Gallagher LLP (totaling $383,840.92), and Bradley Arant Boult Cummings LLP (totaling $24,537.52), were provided to BNP and are attached to the Complaint as part of Exhibit B thereto. Both firms charged their usual and customary rates for the work they performed. (*See* Shaloub Decl. ¶¶ 3-4; Norton Decl. ¶¶ 3-4.) The bills show, among other things, the work undertaken, the date, attorney, the time, amount charged for each task, and itemized expenses (*see* Cplt, Ex. B.), and demonstrate the reasonableness of the attorneys' fees requested. *See, e.g.*, *Norwest Fin., Inc. v. Fernandez*, 121 F. Supp. 2d 258, 262 (S.D.N.Y. 2000) (copies of invoices along with declaration that firm charged its "usual and customary rates" sufficient to demonstrate reasonableness); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 912 F. Supp. 77, 84 (S.D.N.Y. 1996) (approving attorneys' fees as reasonable where applicant supplied description of the work performed, the date the work was performed, the attorney performing the work, the time expended, the billing rates for the attorneys involved, and expenses incurred during the billing period); *Banca Della Svizzera Italiana v. Cohen*, 756 F.

Supp. 805, 808 (S.D.N.Y. 1991) (approving attorneys' fees where applicant's affidavit "stated that the attorneys' hourly rates for which it seeks compensation are Sidley & Austin's standard rates" and the "attorneys sufficiently documented their hours by setting forth an account of all the hours billed and a summary description of how those hours were spent").

The attorneys' fees incurred by the Participating Lenders in connection with the enforcement of the Obligations under the Credit Agreement are reasonable and authorized by Section 10.2. Accordingly, this Court should order that the attorneys' fees and appraisal-related fees totaling $648,782.13 be paid forthwith.

## CONCLUSION

For the reasons set forth herein, Certain Participating Lenders state that interpleader is proper pursuant to 28 U.S.C. § 1335 and respectfully request that the Court enter summary judgment in their favor and order providing for the payment of Participating Lenders' Enforcement Fees and Expenses.

Dated:   New York, New York
         September 18, 2009

WILLKIE FARR & GALLAGHER LLP

By: _____
Joseph T. Baio (jbaio@willkie.com)
(A Member of the Firm)

787 Seventh Avenue
New York, New York  10019
Phone: (212) 728-8000
Fax: (212) 728-8111

*Attorney for the Black Diamond, Denali, and Eaton Vance Entities and General Electric Capital Corporation*