UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
BNP PARIBAS,                            :
            Interpleader-Plaintiff,     :
                                        :    09 Civ. 5351 (DLC)
            -v-                         :
                                        :    OPINION & ORDER
WAYZATA OPPORTUNITIES FUND II, L.P.     :    _____
et al.,                                 :
            Interpleader-Defendants.    :
                                        :
----------------------------------------X

APPEARANCES:

For Interpleader-Defendants Black Diamond Entities, Eaton Vance
Entities, Denali Entities, and General Electric Capital
Corporation:

Joseph T. Baio
Joanna R. Rotgers
Jaime L. Lavin
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019

For Interpleader-Defendant Wayzata Opportunities Fund II, L.P.:

Frank S. Occhipinti
Charles A. Stewart, III
Stewart Occhipinti, LLP
65 West 36th Street, 7th Floor
New York, New York 10018

DENISE COTE, District Judge:

This Opinion addresses a motion for summary judgment filed in this interpleader action.  Certain Participating Lenders[1] in a credit agreement -- interpleader-defendants here -- claim the exclusive right to $648,782.13 in proceeds (the "Disputed Proceeds") from the sale of the borrower's assets, which constituted the collateral under the credit agreement.  On September 18, 2009, the Participating Lenders filed this motion for summary judgment seeking distribution of the Disputed Proceeds, now held in the Court's Registry.  The motion is opposed by another Lender and interpleader-defendant, Wayzata Opportunities Fund II, L.P. ("Wayzata").  The motion became fully submitted on October 16.  For the following reasons, the motion is granted.

---

[1] The certain Participating Lenders ("Participating Lenders") are a group of interpleader-defendants comprised of the following entities:  Black Diamond Capital Management, L.L.C., Black Diamond Commercial Finance, L.L.C., BDCM Opportunity Fund II, L.P., Black Diamond International Funding, Ltd., Black Diamond CLO 2006-01 (Cayman), Ltd., Black Diamond CLO 2005-1 Ltd., and Black Diamond CLO 2005-2 Ltd. (collectively, "Black Diamond Entities"); Senior Debt Portfolio, Eaton Vance Institutional Senior Loan Fund, Eaton Vance Short Duration Diversified Income Fund, Eaton Vance Limited Duration Income Fund, Eaton Vance VT Floating-Rate Income Fund, Eaton Vance Floating-Rate Income Trust, Eaton Vance Senior Floating-Rate Trust, and Grayson & Co. (collectively, "Eaton Vance Entities"); Denali Capital V, LTD, Denali Capital VI, LTD, and Denali Capital VII, LTD (collectively, "Denali Entities"); General Electric Capital Corporation; Diamond Springs Trading, LLC; Classic Cayman B.D. Ltd.; Beltway Capital, LLC; Serves 2006-1, Ltd.; Regiment Capital LTD; Cavalry CLO I, LTD; PPM Monarch Bay Funding LLC; and PPM Shadow Creek Funding LLC.

BACKGROUND

The following facts are undisputed unless otherwise noted.
In a credit agreement dated as of January 31, 2006 (the "Credit
Agreement"), the Participating Lenders and other Lenders[2],
including Wayzata, agreed to make loans to a company now known
as Propex Fabrics, Inc. ("Propex").[3]  Interpleader-plaintiff BNP
Paribas ("BNP"), in addition to being a Lender, was appointed
Administrative Agent pursuant to section 9.1 of the Credit
Agreement.[4]  In the aggregate, Lenders loaned approximately $230
million to Propex under the Credit Agreement.  Section 10.2 of

---

[2] The Credit Agreement defines "Lender" and "Lenders" as "the
Persons identified as 'Lenders' and listed on the signature
pages of [the Credit] Agreement, together with their successors
and permitted assigns pursuant to subsection 10.1 . . .;
provided that the term 'Lenders', when used in the context of a
particular Commitment, shall mean Lenders having that
Commitment."

[3] Section 10.15 of the Credit Agreement provides that New York
law shall apply to the interpretation and enforcement of the
agreement.

[4] Section 9.2 of the Credit Agreement defines the powers and
duties of the Administrative Agent.  Section 9.2(A) provides, in
pertinent part:

> Each Lender irrevocably authorizes Administrative
> Agent to take such action on such Lender's behalf and
> to exercise such powers, rights and remedies hereunder
> and under the other Loan Documents as are specifically
> delegated or granted to Administrative Agent by the
> terms hereof and thereof, together with such powers,
> rights and remedies as are reasonably incidental
> thereto.  Administrative Agent shall have only those
> duties and responsibilities that are expressly
> specified in this Agreement and the other Loan
> Documents, together with such powers, rights and
> remedies as are reasonably incidental thereto.

the Credit Agreement provides that, among other expenses, Propex must pay the fees and expenses incurred by the Administrative Agent and Lenders in enforcing any obligations[5] under the Loan Documents.  Section 10.2(ix) states that Propex shall pay:

> [A]ll costs and expenses, including reasonable attorneys' fees . . ., fees, costs and expenses of accountants, advisors and consultants and costs of settlement, <u>incurred by Administrative Agent and Lenders</u> in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder or under the other Loan Documents (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Loan Documents) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings.

(Emphasis added.)

On January 18, 2008, Propex filed for bankruptcy protection, which constituted an Event of Default under the Credit Agreement.  In early 2009, the bankruptcy court approved a "stalking horse" bid procedure for the sale of Propex's assets, which constituted the collateral under the Credit Agreement.  The bankruptcy court used a $61.56 million bid for Propex's assets by certain entities controlled by Wayzata as the

---

[5] The Credit Agreement defines "Obligations" as:

> [A]ll obligations of every nature of each Loan Party from time to time owed to Administrative Agent, Lenders or any of them under the Loan Documents, whether for principal, interest, reimbursement of amounts drawn under Letters of Credit, fees, expenses, indemnification, or otherwise.

stalking horse bid.  On March 18, 2009, the Participating Lenders filed a conditional objection in the bankruptcy court to the proposed sale, arguing, inter alia, that the $61.56 million bid would result in the sale of Propex's assets -- the Lenders' collateral -- for less than their liquidation value and that the bid would likely be adjusted downward to approximately $36 million.[6]  In connection with the filing of their conditional objection, the Participating Lenders incurred fees and expenses, including attorneys' fees, totaling $648,782.13.[7]  These fees and expenses, i.e., the Disputed Proceeds, are the object of the instant interpleader action.

At a bankruptcy court-approved auction for Propex's assets held on March 23, 2009, entities controlled by Wayzata submitted a successful fixed bid of $82 million.  The Participating Lenders submitted an unsuccessful bid of approximately $81 million.  Following the auction, the Participating Lenders

---

[6] The Participating Lenders had also filed a joinder to an earlier objection filed by BNP, as administrative agent, to the auction bid procedures proposed for the sale of Propex's assets.

[7] The expenses incurred in connection with the filing of the objection in bankruptcy court are comprised of: (1) $383,840.92 in attorneys' fees owed to Wilkie Farr & Gallagher LLP; (2) $24,537.52 in attorneys' fees owed to Bradley Arant Boult Cummings LLP; and (3) $240,403.69 owed to Hilco Appraisal Services.  Approximately $12,416 of the attorneys' fees was incurred by the Participating Lenders in connection with the filing of a joinder to BNP's objection to the auction bid procedures.

withdrew their conditional objection to the sale of Propex's assets.  The sale closed on April 27.

In a letter dated April 24, 2009, the Participating Lenders requested that BNP, as Administrative Agent, pay the fees and expenses incurred in connection with the filing of the conditional objection during the bankruptcy auction of Propex's assets pursuant to section 10.2(ix) of the Credit Agreement. The letter noted that Participating Lenders only sought payment for fees and expenses incurred in connection with the enforcement of Obligations and not those incurred in connection with their unsuccessful bid for Propex's assets.[8]  BNP declined. In late April, following the receipt of the proceeds from the sale of Propex's assets, BNP made final pro rata distributions to the Lenders, but withheld the Disputed Proceeds.

By letter dated May 15, 2009, the Participating Lenders notified BNP that they had amended section 2.4(D) of the Credit Agreement, which governs the order in which the Administrative

---

[8] In support of their request, the Participating Lenders submitted with the April 24 letter the invoices received from Hilco Appraisal Services and from the law firms.  In addition, both law firms have submitted affidavits to this Court and attest that their invoices were prepared using their usual and customary billing rates at the time the bills were issued. Wayzata denies that the Participating Lenders limited their request for attorneys' fees to those incurred in connection with the enforcement of Obligations.  Wayzata does not, however, point to any mistakes in the invoices or offer any evidence to call the amounts billed into question.  Further, Wayzata has not requested additional discovery on this issue pursuant to Fed. R. Civ. P. 56(f).

Agent is to distribute the proceeds from the sale of Propex's
assets (the "May 15 Amendment").[9]  The May 15 Amendment inserted
a provision to require a priority distribution by the
Administrative Agent of "Enforcement Fees and Expenses
referenced in the April 24 Letter, and such other fees and
expenses incurred by one or more of the Participating Lenders'
enforcement of the Obligations."  Such enforcement fees and
expenses were to be paid after the Administrative Agent paid its
own fees and expenses, but before any other distributions.  The
Participating Lenders contend that they held more that 50% of
the aggregate loans outstanding under the Credit Agreement[10], and

---

[9] Prior to the amendment, section 2.4(D) provided that proceeds
should be distributed as follows:  first, to the payment of
costs and expenses of the Administrative Agent; second, to the
payment of all other Obligations to Lenders on a pro rata basis;
and third, to the payment to Propex or others lawfully entitled
to the same as a court may direct.

[10] As evidence of this fact, the Participating Lenders submitted
an affidavit which attests that the Participating Lenders held
more than 50% of the aggregate loans outstanding, as well as a
spreadsheet prepared by BNP's counsel which reflects the
holdings and percentage of aggregate exposure of each of the
Lenders in the Credit Agreement as of March 18, 2009.  Wayzata
denies that the Participating Lenders owned more that 50% of the
loans outstanding and objects to the evidence introduced by the
Participating Lenders to support this fact as inadmissible.
Wayzata does not, however, produce any evidence to call this
fact into question, nor has Wayzata requested additional
discovery on this issue pursuant to Fed. R. Civ. P. 56(f).

thus comprised the "Requisite Lenders" whose consent was necessary to make the May 15 Amendment.[11]

Despite the May 15 Amendment, BNP still did not pay the enforcement fees and expenses as requested by the Participating Lenders. On June 9, BNP filed this interpleader action pursuant to 28 U.S.C. § 1335, requesting that the Court resolve the distribution of the Disputed Proceeds. On June 17, BNP deposited $648,782.13, the amount of the Disputed Proceeds, into the Court's Registry. On September 18, the Participating Lenders filed a motion for summary judgment seeking an order instructing BNP to distribute all of the Disputed Proceeds to them.[12] Wayzata filed an opposition on October 9 in which it argues, inter alia, that section 10.2(ix) does not authorize payment of the enforcement fees and expenses sought by the Participating Lenders and that the May 15 Amendment is invalid.

---

[11] Section 10.6 of the Credit Agreement provides that, except in certain cases inapplicable here, "[n]o amendment, modification, termination or waiver of any provision of this Agreement or of the Notes . . . shall in any event be effective without the written concurrence of Requisite Lenders." Section 1.1. of the Credit Agreement, in turn, defines "Requisite Lenders" as "Lenders having or holding more than 50% of the sum of the aggregate Tranche B Term Loan Exposure of all Lenders plus the aggregate Bridge Loan Exposure of all Lenders plus the aggregate Revolving Loan Exposure of all Lenders," which is all of the loans under the Credit Agreement.

[12] On or about October 9, the Participating Lenders paid $383,840.92 to Willkie Farr & Gallagher LLP, $24,537.52 to Bradley Arant Boult Cummings LLP, and $240,403.69 to Hilco Appraisal Services. Participating Lenders now seek reimbursement from the Administrative Agent for those amounts.

Instead, Wayzata seeks pro rata distribution to all Lenders of
the Disputed Proceeds.

                              DISCUSSION

     Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Fed. R. Civ. P. 56(c); see SCR
Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir.
2009). The moving party bears the burden of demonstrating the
absence of a material factual question, and in making this
determination, the court must view all facts in the light most
favorable to the non-moving party. Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986); Roe v. City of Waterbury, 542 F.3d 31,
35-36 (2d Cir. 2008). When the moving party has asserted facts
showing that the non-movant's claims cannot be sustained, the
opposing party must "set forth specific facts showing that there
is a genuine issue for trial," and cannot rest on the "mere
allegations or denials" contained in the pleadings. Fed. R.
Civ. P. 56(e); Wright v. Goord, 554 F.3d 255, 266 (2d Cir.
2009). That is, the nonmoving party "must do more than simply
show that there is some metaphysical doubt as to the material
facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986). Only disputes over material facts --
facts that might affect the outcome of the suit under the

                                  9

governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); SCR Joint Venture, 559 F.3d at 137.

The dispute between the Participating Lenders and Wayzata hinges on the interpretation of section 10.2(ix) of the Credit Agreement and the validity of the May 15 Amendment.  Under New York law, which the parties do not dispute applies here, "[i]t is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself."  MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009); accord JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  MHR Capital Partners, 912 N.E.2d at 47.  The question of whether a contract is ambiguous is a question of law for the court.  JA Apparel, 568 F.3d at 396.  Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion."  White v. Continental Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007) (citation omitted).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different

interpretations in the litigation." <u>JA Apparel</u>, 568 F.3d at 396.  If the contract is unambiguous, its meaning is likewise a question of law for the court.  <u>Id.</u> at 397.  "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).

Section 10.2(ix) of the Credit Agreement is unambiguous. It requires Propex to pay "all costs and expenses, including reasonable attorneys' fees . . . <u>incurred by</u> Administrative Agent and <u>Lenders in enforcing any Obligations</u> of . . . any Loan Party hereunder or under the other Loan Documents . . . ." (Emphasis added.)  As provided in section 1.1 of the Credit Agreement, such "Obligations" include "<u>all obligations</u> of every nature of each Loan Party from time to time <u>owed to</u> Administrative Agent, <u>Lenders or any of them</u> under the Loan Documents . . . ."  (Emphasis added.)  Because some Obligations may be owed to less than all Lenders, section 10.2(ix) must be interpreted to require Propex to pay the fees and expenses incurred by <u>any</u> of the Lenders in enforcing Obligations owed to them under the Credit Agreement -- even if such fees and expenses are not incurred by <u>all</u> Lenders.  Thus, by the plain language of section 10.2(ix), Propex was obligated to pay the

enforcement fees and expenses, including reasonable attorneys'
fees, incurred by the Participating Lenders.

Further, the May 15 Amendment to section 2.4(D) made
explicit that BNP was to distribute to the Participating Lenders
on a priority basis the "Enforcement Fees and Expenses
referenced in the April 24 Letter." The Credit Agreement
permits the "Requisite Lenders" to amend the agreement except in
certain circumstances inapplicable here. The Participating
Lenders held more than 50% of the outstanding loans under the
Credit Agreement at the time of the May 15 Amendment, and thus
constituted the "Requisite Lenders" needed to amend section
2.4(D). Thus, the May 15 Amendment was valid. As such, BNP
should have paid the enforcement fees and expenses incurred by
the Participating Lenders after it paid its own fees and
expenses. The Participating Lenders are therefore entitled to
summary judgment.

Wayzata argues that the Participating Lenders are not
entitled to the Disputed Proceeds and that summary judgment is
inappropriate. It first contends that section 10.2(ix) of the
Credit Agreement should be interpreted to permit payment of only
those fees and expenses incurred by the Administrative Agent and
all Lenders in enforcing Obligations under the Credit Agreement.
This interpretation is belied by the plain language of the

provision, as well as the context in which it appears in the Credit Agreement.

First, the Credit Agreement does not restrict the term "Lenders" to mean only all Lenders.  While section 1.1 of the Credit Agreement defines "Lenders" as referring to the group of Lenders collectively, it does not limit the definition to all Lenders.  To the contrary, the definition acknowledges that, depending on the "context" in which the term is used in the Credit Agreement, "Lenders" may sometimes refer to a subset of Lenders.

Second, it makes no sense to interpret section 10.2(ix) to require that enforcement fees and expenses be incurred jointly by the Administrative Agent and the Lenders collectively, or by all Lenders.  Such a narrow reading of the provision would create tension with other provisions of the Credit Agreement, which is to be avoided.  See LaSalle Bank, 424 F.3d at 206 ("[T]he contract should be construed so as to give full meaning and effect to all of its provisions.").  As discussed above, section 1.1 of the Credit Agreement provides that Obligations may be owed to the Administrative Agent, the Lenders, or any of them.  The Credit Agreement thus contemplates that some Lenders may incur fees and expenses from time to time in enforcing Obligations owed only to them, but not all Lenders, which Propex must nonetheless pay pursuant to section 10.2(ix).

Third, unlike other subsections of section 10.2 -- such as subsections (iii), (iv), (v), (vi), (vii), and (viii) -- subsection (ix) does <u>not</u> refer exclusively to the Administrative Agent's right to recoup certain fees and expenses from Propex. Instead, it clearly states that this right belongs to the "Administrative Agent <u>and</u> Lenders." The context of this provision suggests that the parties to the Credit Agreement knew how to limit the payment of fees and expenses to those incurred solely by the Administrative Agent on behalf of itself and all Lenders, but chose not to do so with respect to subsection (ix). Further, the addition of "and Lenders" would be superfluous if, as Wayzata suggests, this provision only allows the Administrative Agent to collect fees and expenses incurred on behalf of all Lenders.[13]   Wayzata's interpretation must therefore

---

[13] Wayzata argues that pursuant to sections 9.1 and 9.2 of the Credit Agreement, the Lenders delegated to the Administrative Agent the authority to seek payment of enforcement fees and expenses incurred on behalf of the Lenders. Wayzata quotes a portion of section 9.2 of the Credit Agreement that authorizes the Administrative Agent to "take such action on [each] Lender's behalf and to exercise such powers, rights and remedies . . . as are reasonably incidental thereto." As noted above, however, section 9.2 limits the powers delegated to the Administrative Agent to those that "are <u>specifically delegated or granted</u> to Administrative Agent by the terms [of the Credit Agreement and other Loan Documents]." (Emphasis added.) Wayzata points to no provision of the Credit Agreement that "specifically delegate[s] or grant[s]" BNP the exclusive right to collect enforcement fees on behalf of any or all Lenders. Moreover, section 9.8 of the Credit Agreement, which concerns the Administrative Agent's powers in the event of bankruptcy, provides, in pertinent part:

be rejected.   See ReliaStar Life Ins. Co. of N.Y. v. EMC Nat.
Life Co., 564 F.3d 81, 88 (2d Cir. 2009) ("Under New York law,
an interpretation of a contract that has the effect of rendering
at least one clause superfluous or meaningless . . . is not
preferred and will be avoided if possible." (citation omitted)).
Thus, the only reasonable interpretation of section 10.2(ix) is
that the fees and expenses incurred by the Administrative Agent
shall be borne by Propex, and the fees and expenses incurred by
some or all of the Lenders shall also be borne by Propex.

Wayzata next argues that summary judgment is inappropriate
because a question of material fact exists as to whether the
Participating Lenders made the May 15 Amendment in good faith.
Notably, Wayzata does not claim a breach of section 10.6 of the
Credit Agreement, which concerns the conditions under which
amendments may be made.   Instead, Wayzata contends that
"circumstances strongly indicate that the amendment was

---

Nothing herein contained shall be deemed to authorize
Administrative Agent to authorize or consent to or
accept or adopt on behalf of any Lender any plan of
reorganization, arrangement, adjustment or composition
affecting the Obligations or the rights of any Lenders
or to authorize Administrative Agent to vote in
respect of the claim of any Lender in any such
proceeding.

(Emphasis added.)   Section 9.8 thus appears to preserve the
right of any Lender to enforce Obligations owed to it during a
bankruptcy proceeding.   Section 10.2(ix), in turn, requires that
Propex pay the fees and expenses incurred in connection with any
such enforcement efforts by any Lender.

motivated by animus towards Wayzata" and therefore the
Participating Lenders "violated the covenant of good faith and
fair dealing."  This argument fails as a matter of law.
"Integral to a finding of a breach of the implied covenant [of
good faith and fair dealing] is a party's action that directly
violates an obligation that may be presumed to have been
intended by the parties."  M/A-COM Sec. Corp. v. Galesi, 904
F.2d 134, 136 (2d Cir. 1990).  Wayzata suggests that the Credit
Agreement should be construed to permit only those amendments
that "advance the interests of either all or a majority of the
Lenders and not merely to disadvantage one Lender and benefit
another."  The Credit Agreement contains no such requirement.
The implied covenant of good faith and fair dealing "can only
impose an obligation consistent with other mutually agreed upon
terms in the contract.  It does not add to the contract a
substantive provision not included by the parties."  Broder v.
Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005)
(citation omitted); see also Thyroff v. Nationwide Mut. Ins.
Co., 460 F.3d 400, 408 (2d Cir. 2006) ("[T]he implied covenant
does not extend so far as to undermine a party's general right
to act on its own interests in a way that may incidentally
lessen the other party's anticipated fruits from the contract."
(citation omitted)).  Thus, no rational trier of fact could
conclude that in amending the Credit Agreement to distribute the

enforcement fees and expenses -- to which they were entitled pursuant to section 10.2(ix) -- the Participating Lenders violated any provision of the Credit Agreement or acted in bad faith.  See Thyroff, 460 F.3d at 408; see also Roswell Capital Partners LLC v. Alternative Const. Technologies, 638 F.Supp.2d 360, 371 (S.D.N.Y. 2009) (Cote, J.) ("[E]xercising contract rights to protect an investment does not constitute bad faith." (citation omitted)).

Finally, Wayzata argues that there are genuine issues of material fact as to the reasonableness and necessity of the fees and expenses incurred by the Participating Lenders which precludes summary judgment.  This argument is also without merit.

First, Wayzata alleges that the attorneys' fees requested by the Participating Lenders may include attorneys' fees incurred in connection with their unsuccessful bid for Propex's assets during the bankruptcy auction.  Yet Wayzata points to no particular entries in the law firms' invoices, or any other evidence, to undermine the evidence submitted by the Participating Lenders in support of the reasonableness of the attorneys' fees.[14]  As such, this allegation is insufficient to overcome summary judgment.  Wright, 554 F.3d at 266.

---

[14] Wayzata has not requested additional discovery on this issue pursuant to Fed. R. Civ. P. 56(f).

Second, Wayzata contends that the Participating Lenders'
enforcement efforts during the bankruptcy auction of Propex's
assets were "duplicative" of BNP's efforts, and therefore
unreasonable.[15]  Wayzata points specifically to the Participating
Lenders' filing of a joinder to BNP's objection to Propex's
motion to approve the auction bid procedures.  To be sure,
courts may reduce attorneys' fees in circumstances "where the
attorneys essentially duplicated each other's efforts."  Carrero
v. New York City Hous. Auth., 685 F.Supp. 904, 908 (S.D.N.Y.
1988), aff'd, 890 F.2d 569 (2d Cir. 1989); see also Kapoor v.
Rosenthal, 269 F.Supp.2d 408, 414-15 (S.D.N.Y. 2003)
(disallowing attorney's fees for work that was "duplicative
and/or excessive").  Such is not the case here.  The joinder
filed by the Participating Lenders amplified and explained in
greater detail concerns presented in BNP's objection and
therefore was not "duplicative" of BNP's efforts.  Moreover, the
attorneys' fees incurred in filing the joinder is a small
fraction -- approximately three percent -- of the total
attorneys' fees sought by the Participating Lenders in

[15] To the extent Wayzata's argument suggests that the appraisal
fees incurred in connection with the Participating Lenders'
enforcement efforts may not have been "necessary," this argument
is misplaced.  Section 10.2(ix) contains no requirement that
such expenses incurred in connection with the enforcement of
Obligations under the Credit Agreement be "necessary."  The
Participating Lenders are thus entitled to payment of these
expenses.

connection with the enforcement efforts during the bankruptcy auction.  The bulk of Participating Lenders' attorneys' fees was incurred in connection with the filing of the conditional objection to the initial stalking horse bid, which Wayzata does not argue was duplicative of BNP's efforts or unreasonable. Wayzata points to no other evidence to support its claim that the attorneys' fees were unreasonable.  As such, Wayzata has failed to meet its burden to overcome summary judgment.

## CONCLUSION

The September 18, 2009 motion for summary judgment is granted.  The disputed proceeds of $648,782.13 held in the Court's Registry shall be distributed to the Participating Lenders pursuant to a separate Order to follow.  The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          December 23, 2009

DENISE COTE
United States District Judge

19